**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| RICKIE A. WHEAT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 6:09-CV-03142-DGK |
| | ) | |
| PHILIP MORRELL, and | ) | |
| WHISPERIDE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER PARTIALLY GRANTING MOTION FOR SUMMARY JUDGMENT

This case arises from a business relationship between the parties. Plaintiff Rickie Wheat ("Wheat") alleges Defendants Philip Morrell ("Morrell") and Whisperide, LLC ("Whisperide") owe him approximately $800,000 for services rendered and personal property delivered to Defendants, and $4,000,000 for conversion of a patent on a horse bridle and also trademark infringement. Presently before the Court is Defendants' Motion for Partial Summary Judgment (Doc. 91). Defendants move for partial summary judgment on Count I – III, IV-VI, and VII of the First Amended Complaint.

For the following reasons the motion is GRANTED IN PART. Defendants are granted summary judgment on Counts I, II, III, and VII, and partial summary judgment on Count IV. The motion is denied with respect to Counts V and VI.

### Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the

burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. But the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

**Facts**

Viewing the evidence in the light most favorable to Plaintiff Wheat, for purposes of resolving the pending motion the Court finds the facts to be as follows. The Court has omitted properly controverted facts[1] and facts immaterial to the resolution of the pending motion.

Phillip Morrell, a Utah resident who has a livestock ranch in Missouri, orally agreed to pay Wheat $2,500 per week to work as a horse trainer and to manage Morrell's ranch in Missouri, among other services. The agreement did not specify an ending point, nor did it speak to the grounds on which Wheat might be discharged. The agreement began on or about July 27, 2007 and ended in June, 2008, a period of 48 weeks.

---

[1] Local Rule 56.1 provides that "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party." Although Plaintiff suggests there are disputed issues of fact, he does not specifically controvert most of the facts alleged in Defendants' statement of facts, thus these facts are deemed admitted.

On or about November 5, 2007, Morrell opened a bank account at the BTC Bank in Gallatin, Missouri and deposited $150,495.00 into that account. Wheat was authorized to write checks and otherwise withdraw money from the account, and Wheat expected to be paid out of the Gallatin Bank account under the agreement.

Between November 2007 and July 2008 Wheat withdrew at least $121,899.51 from the account for his personal use. These funds were compensation for services rendered by him under the agreement. Wheat took $100,000 out of the account on or about June 23, 2008 for his personal use, and $12,000 out of the account on or about March 18, 2008 for his personal use. He took $2,610.39 out to pay his personal insurance premiums; $2,114.82 out to pay his personal telephone bills with CenturyTel; $2,013.99 out to pay his personal electric bills with Entergy; $1,243.00 out for personal use by himself and his wife, Penny Wheat; and $1,036.61 out to pay his personal phone bills with Cingular. Wheat also took $418.44 out of the account to pay his personal home heating bills with Hurley Gas Company; $178.76 out to pay his personal account with Dish Network; and $567.00 out to pay Joel Wagner for hay to feed horses, half of which went to feed horses owned by Wheat.

Whisperide, a Utah limited liability company established by Morrell to market and sell the Noavel headstalls at issue in this case, also paid legal fees to an attorney at Wheat's request and on Wheat's behalf for legal matters unrelated to his employment agreement or business dealings with Morrell or Whisperide. These bills totaled $7,545.82. On or about December 13, 2007, at Wheat's request and in lieu of direct monetary compensation, Morrell also paid $26,888.48 for a new Chrysler 300C automobile for Wheat's use. Wheat was the only person to use the car and still has possession of it and title to it. The car was completely paid for by Morrell, and Wheat has never paid anything for it.

Wheat alleges that Defendants converted U.S. Patent No. 6,643,999 on which Wheat is the named inventor, by filing a Notice of Assignment with the United States Patent and Trademark Office, thereby "caus[ing] the Patent Office to transfer registered ownership of the patent from Wheat to Whisperide" and "convert[ing] the Patent to their own use." Subsequent to Defendants' Patent Office filing, Wheat has continued to manufacture, have manufactured on his behalf, and sell Noavel headstalls covered by the patent. The molds used to manufacture the metal frame of the headstall were never in Defendants' possession and are currently in the possession of Jeff Gillihan of Mount Pleasant Arkansas, an individual Wheat has used since approximately 2004 to manufacture headstalls on his behalf. Wheat also received invoices related to the manufacture and assembly of Noavel headstalls on September 29, 2008 and December 26, 2008 from Mr. Hostetler, an individual who provided the leather components for the headstalls and assembled them at Wheat's request.

Wheat is, and has been, in the business of manufacturing and selling Noavel headstalls since 2002. He sells Noavel headstalls wholesale and as a retailer.

In early December 2007 Wheat delivered his entire inventory of Noavel headstalls and reins to Defendant Whisperide's facility located in Bluffdale, Utah. There is a disputed question of fact concerning how many headstalls and reins Wheat actually delivered.[2]

The cost of production for the components of a Noavel headstall is $43.75; the cost of production of a set of reins is between eight and ten dollars. Wheat can manufacture 100 Noavel headstalls in about one week, but on average can only sell 20 headstalls in one weekend of work. According to Wheat's 2007 federal income tax return, the total cost of production of inventory at the beginning of 2007 was $1,000. At year end the total cost of production of his inventory was $14,000.

---

[2] Wheat has established a contested question of fact on this point via Tom Newell's affidavit.

Wheat did not report any income on his 2007 federal income tax return from the delivery of inventory to Defendants. Wheat testified there was nothing to report because the delivery was not a sale, he was not paid for the inventory, and the inventory still belonged to him. He would have included the inventory he delivered to Defendants on his return if his tax preparer told him he needed to. The return reports that in 2007 he spent $87,778 on the production of goods for sale, and that his production cost of goods sold was $74,778.

Although the First Amended Complaint alleges Morrell told Wheat that he would pay for the delivery of 16 horses and saddles to Morrell's Gallatin, Missouri farm, in his deposition Wheat acknowledged that he had no agreement with Morrell to be compensated for any horses and saddles delivered to Morrell's farm, and those horses and saddles were part of a separate arrangement between Morrell and Wheat's wife.

## Discussion

### A.      Defendants are entitled to summary judgment on Counts I, II, and III.

Counts I, II and III advance contract or quasi-contract claims:    Count I alleges that Defendants breached the employment agreement by failing to pay Wheat $2,500 a week; Count II claims unjust enrichment because Morrell allegedly accepted $130,000 worth of services but only paid Wheat $40,000 for these services; and Count III alleges Morrell should be estopped from denying the enforceability of a promise to pay Wheat for his services. In their summary judgment motion Defendants argue—and Wheat does not deny—that Wheat actually received *more* compensation than he was due under the agreement, thus Defendants are entitled to summary judgment on these counts.

A common element of each of these counts is that Wheat must establish that Defendants failed to pay him for his services.[3] Wheat alleges that Morrell promised to pay him $2,500 per week to act as a horse trainer and to manage Morrell's farm, and that he was employed for one year, thus he is owed $130,000 for this work. ($2,500 x 52 weeks.) The record, however, clearly shows that Morrell actually paid Wheat more than $156,000 in compensation: He provided Wheat with $121,899.51 from the Gallatin Bank account, an automobile worth $26,888.48, and $7,545.82 worth of personal attorney fees paid on Wheat's behalf. Consequently Wheat cannot establish that Defendants failed to pay him for his services, and Defendants are entitled to summary judgment on Counts I, II, and III.

Finally, the Court notes that in his response Wheat suggests for the first time that he is entitled to an additional $85,000 for horse clinics he gave. These allegations are not in Counts I – III of the Amended Complaint, and it is too late for Plaintiff to introduce them now.

**B.      Wheat's damages for conversion of the headstalls and reins are limited to the cost of production, which is at most $204,327.50.**

Count IV alleges Defendants unlawfully converted 4,210 Noavel headstalls, 2,014 sets of Noavel reins, a trailer, and 16 horses and saddles to their own use. Defendants contend—and Wheat does not dispute—that because the headstalls and reins were inventory held as stock for sale, the proper measure of damages for conversion is the cost of the owner to produce or acquire the property. They argue Wheat's cost to produce the headstalls and reins was no more than $204,327.50, thus his conversion damages are limited to this amount.

---

[3] *See White v. White*, 293 S.W.3d 1, 23 (Mo. Ct. App. 2009) (holding that to recover for breach of contract plaintiff must establish that defendant did not perform); *Berra v. Papin Builders, Inc.*, 706 S.W.2d 70, 73 (Mo. Ct. App. 1986) (holding plaintiff must establish defendant failed to pay the reasonable value of materials and labor for quantum meruit claim); *Miller v. Horn*, 254 S.W.3d 920, 924 (Mo. Ct. App. 2008) (holding plaintiff must show unjust enrichment was at the plaintiff's expense); *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (en banc) (holding plaintiff must show defendant's action resulted in an injustice that only enforcement of the promise could cure)

Under Missouri law "[t]he measure of damages recoverable in an action for conversion of personal property is generally the fair market value of the property at the time and place of the conversion." *Bell v. Lafont Auto Sales*, 85 S.W.3d 50, 54 (Mo. Ct. App. 2002).  As a rule, fair market value is the price at which the property would sell "when it is offered for sale by an owner who is willing but under no compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so." *Id.*  But where the property at issue is held as stock for sale rather than consumption, the fair market value of the property is equal to the cost of producing the inventory for sale. *Nika Corp v. City of Kansas City, Mo.*, 582 F. Supp. 343, 357 (W.D. Mo. 1983).  Thus, the proper measure of damages for conversion of a stock of goods held for sale is not what it would cost the converter to acquire the property, but "what it would cost the owner, at the time of the conversion, to produce or acquire the property in question." *Id.* at 357.

In the present case there is no dispute that Wheat's inventory of headstalls and reins was held for sale, not consumption, thus the fair market value of the equipment is equal to its cost of production to Wheat.  Wheat has alleged conversion of 4,210 headstalls and 2,014 sets of reins with production costs of \$43.75 and up to ten dollars, respectively.  Accordingly the maximum amount of damages Wheat can recover for these items is \$204,327.50 (4,210 headstalls x \$43.75 = \$184, 187.50; 2,014 reins x \$10 = \$20,140; \$184.187.50 + \$20,140 = \$204,327.50).

Defendants also argue that Wheat has wildly inflated the amount of inventory he delivered.  Their argument is as follows:  Wheat claims he delivered his entire inventory of headstall and reins to Defendants in early December 2007.  But his 2007 federal income tax return, which was signed under penalty of perjury, reports he began 2007 with \$1,000 in

inventory and ended the year[4] with \$14,000 in inventory, thus Wheat could not have delivered more than 320 headstalls (\$14,000 ÷ \$43.75 cost of production for each headstall = 320 headstalls). Even if the inventory Wheat claimed he delivered was not included in the year end inventory figure on his tax return, but was reflected in the cost of goods sold, he cannot substantiate the inventory levels he claims he delivered. Wheat reported cost of goods sold of \$74,778. If this were all inventory and Wheat delivered all of it to Defendants, Wheat could not have delivered more than 1,709 headstalls (\$74,778 ÷ \$43.75 = 1,709.2 units); if the inventory included sets of reins the quantity would be even lower. Finally, assuming for the sake of argument that every cost in Wheat 2007 return could be attributed to inventory delivered to Defendants, the amount of equipment would not be close to the amount allegedly converted. Adding the \$87,778 reportedly spent on the production of goods for sale in 2007 to the \$1,000 worth of beginning inventory, at no point in the year would Wheat have had more than 2,029 headstalls to deliver (\$88,778 ÷ \$43.75 = 2,029.2 units). Defendants conclude that any way one views these numbers Wheat's conversion claim is grossly exaggerated.

Defendants are essentially arguing that Wheat is estopped from claiming he delivered any inventory that cannot be discerned from his federal tax return. Defendants have not, however, cited any persuasive caselaw for this proposition.[5] While the apparent discrepancy between the amount of equipment Wheat alleges to have delivered and the amount he reported in his tax return may well provide fertile ground for cross-examination, it does not as a matter of law preclude Wheat from claiming to have delivered 4,210 headstalls and 2,014 sets of reins. There

---

[4] The fiscal year ending December 31, 2007, a few weeks after the inventory was allegedly delivered to Defendants.

[5] Defendants have cited *International Painters and Allied Trades Industry Pension Fund v. KKB, L.L.C.*, 421 F. Supp. 2d 71 (D.D.C. 2006), but it is not particularly analogous to this case. In *International Painters* the court used the defendant's tax return to establish that the defendant was a business operated for the purpose of income or profit; the court did not use the return to estop the defendant from asserting a contested fact. *Id.* at 75-76.

are innocent explanations for the discrepancy; for example, Wheat or his preparer could have made a mistake on his tax returns. And even if Wheat had committing perjury by knowingly submitting false tax returns it would not mean he did not deliver the amount of equipment he alleges he delivered. While it would diminish his credibility and adversely affect his case in other ways, credibility is determined at trial, not on a motion for summary judgment. Accordingly this portion of the motion is denied.

**C.      Partial summary judgment is denied on Counts V and VI.**

As alternatives to the conversion claim in Count IV, Wheat pleads breach of contract in Count V and promissory estoppel in Count VI for Defendants alleged failure to pay for the equipment he provided to Defendants. Reprising their previous tax return arguments, Defendants contend these claims must fail because Wheat cannot prove he delivered 4,210 headstalls and 2,014 sets of reins, or at the very least, his damages should be limited to the cost of production listed in his 2007 tax return. Defendants contend that given the figures in his tax returns there is no way Wheat could have delivered more than 1,709 headstalls in 2007, and his damages for these claims should be capped accordingly.

Again, while the tax returns are interesting evidence they do not entitle Defendants to summary judgment as a matter of law. Exactly how many headstalls and rein sets were delivered to Defendants is a disputed question of material fact. Defendants' motion for partial summary judgment on Counts V and VI is denied, with the exception of any claim arising from the delivery of 16 horses and saddles to Morrell's Gallatin, Missouri farm. In his deposition Wheat acknowledged that the horses and saddles were part of a separate arrangement between Morrell and Wheat's wife, thus Wheat may not seek to recover payment for them.

**D.  Summary judgment is granted on Count VII, the patent conversion claim.**

Count VII alleges that by sending a fraudulent notice of assignment to the U.S. Patent and Trademark Office Defendants caused the Patent Office to transfer registered ownership of the patent for the Noavel Headstall from Wheat to Whisperide, thereby converting the patent to Defendants' own use.

Defendants argue that Wheat cannot prove an essential element of his claim, namely that he was deprived of any possessory interest in the patent, because he continues to manufacture and sell the Noavel Headstall and because the notice of assignment did not deprive Wheat of any rights he otherwise had in the patent. Additionally, in a footnote Defendants observe that it does not appear that Missouri law even recognizes a cause of action for conversion of a patent. Wheat's response completely fails to address these arguments and is so conclusory that it is best described as conceding the issue.

The Court rules as follows:[6] Under Missouri law, the tort of conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Breece v. Jett*, 556 S.W.2d 696, 709 (Mo. Ct. App. 1977) quoting *Restatement (Second) of Torts* § 222A (1965). Put another way, "[c]onversion is a tort against the right of possession rather than against the right of title." *Carter v. White*, 241 S.W.3d 357, 361 (Mo. Ct. App. 2007). To prove conversion under Missouri law, a plaintiff must prove that: (1) he was the owner of the property or entitled to possession of it; (2) defendants took possession of the property with the intent to exercise some control over it; and (3) defendants thereby deprived plaintiff of the right to possession of the property. *Monsanto Co. v. Hill*, No. 4:03-CV-181 CEJ, 2004 WL 4996339, at *4 (E.D. Mo. May 21, 2004).

---

[6] This portion of the Court's order is drawn heavily from Defendants' Suggestions in Support (Doc. 94).

In the present case Plaintiff's patent conversion claim fails because Defendants have not deprived Wheat of possession of the Patent, as evidenced by the fact that Wheat continues to manufacture, have manufactured on his behalf, and sell Noavel headstalls covered by the Patent. Wheat also retains custody and control over the molds used to manufacture the metal component of the headstall, and these molds have never been possessed or controlled by Defendants. Invoices also show that Wheat continues to have Noavel headstalls manufactured on his behalf. Indeed, invoices show Wheat continued to manufacture the headstall even after Defendants filed the Notice of Assignment with the Patent Office on October 31, 2008. Consequently Plaintiff cannot say he was denied any possessory interest in the Patent.

Additionally Defendants' filing of a Notice of Assignment did not dispossess Wheat of any rights he otherwise had in the Patent. The Notice of Assignment operated only to put potential third parties on notice of a claim to an interest in the Patent. The process is analogous to recording a lien on a parcel of real property, and like a lien on real property, the Patent Office notice does not affect ownership of the underlying property. "The [Patent Office] has no authority to 'grant' an assignment . . . recordation is a ministerial act and reflects no determination as to the legal validity of the document filed or its effect, if any, on the title to the patent or patent application." 367 F.3d 958, 965 (D.C. Cir. 2004). Thus, Defendants' filing of a Notice of Assignment with the Patent Office had no effect on ownership of the underlying patent.

The Court grants summary judgment to Defendants on Count VII.

11

## Conclusion

Defendants' Motion for Partial Summary Judgment (Doc. 91) is GRANTED IN PART.

Defendants are granted summary judgment on Counts I, II, III, and VII, and partial summary

judgment on Count IV.  The motion is denied with respect to Counts V and VI.

**IT IS SO ORDERED.**

Date:  September 2, 2010                    /s/ Greg Kays
                                            GREG KAYS, JUDGE
                                            UNITED STATES DISTRICT COURT